IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

CHARLES J. QUINN, JR.,

Plaintiff,

vs.                                          Case No. 05-1373-JTM

CITY OF BEL AIRE, KANSAS,

Defendant.

MEMORANDUM AND ORDER

This matter is before the court on the defendant's Objection to Magistrate Order and its Motion for Summary Judgment. In the Objection, the defendant objects to the decision of the United States Magistrate Judge permitting to the plaintiff to advance additional factual theories in the Pretrial Order entered October 12, 2006 (Dkt. No. 37). The court has reviewed the arguments advanced by defendant and finds nothing in the earlier decision which is clearly erroneous. The court will deny the Objection. The court will grant the motion for summary judgment.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual

allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

The court rejects any requested findings which are not founded on admissible evidence. Specifically, the court excludes findings which rely upon evidence which is based on single or double hearsay, based on the purely subjective impressions of an affiant, or which was presented in an untimely fashion and inconsistent with the Federal Rules of Civil Procedure governing discovery.

**Findings of Fact**

The population of Bel Aire, Kansas, is in excess of 6,000 and it is a city of the second class under Kansas statutory authority. The form of government utilized in Bel Aire is Mayor/City Administrator. There are five members of the City Council who are elected at large and an elected Mayor.

Gary O'Neal was first elected Mayor of Bel Aire in 1999 and was reelected in 2001 and 2003. The mayor, by and with the consent of the council, appoints the chief of police. Once appointed and confirmed, a chief of police can be reappointed "for a term of one year and until their successors are appointed and qualified." KSA 14-201.

O'Neal appointed Chuck Quinn as Chief of Police on December 7, 1999.  At that time, the department had eight full-time officers. As chief, Quinn supervised these officers and reported to the mayor, the city administrator, and the city counsel. He was also responsible to provide advice and counsel to the mayor on law enforcement issues. Quinn was hired to replace the previous chief, Don Munday. According to O'Neal, the police department had shown a lack of leadership and structure under Munday's management.

Quinn retired from the United States Secret Service on January 25, 2000 to accept the job. He had started with the Secret Service on July 27, 1969. The city had a number of problems for Quinn to address, so he signed on as chief even while working full time with the Secret Service until the following month.

Lee Parker was the city attorney when Quinn was hired. As city attorney, Parker has the authority to advise but not direct the police department.

Nola Foulston is the District Attorney for the 18th Judicial District of Kansas. She was elected in 1988 and sworn in in 1989.  Ann Swegle is an Assistant District Attorney with the District Attorney's office in Sedgwick County and has been for 25 years. (Swegle depo., p. 4-5)  Chuck Quinn was appointed Chief of Police of Bel Aire on December 7, 1999.

Quinn was reappointed as Chief of Police each year from 2000 to 2004.  Mayor O'Neal, in all the years Quinn served, never placed anything derogatory in Quinn's personnel file.  There were a number of comments from citizens about the good job Quinn and the police department were doing, but there was nothing in his personnel file that was critical of him.

In April 2005, after a new mayor was elected, Quinn contacted the new mayor, Brian Withrow, about reinstatement.  Withrow asked Quinn if he could work with Richard Gale, City

Administrator, and Lee Parker, the City's Legal Advisor. Quinn told Withrow that he could work with Parker but not Gale.

Quinn acknowledges that it was important for the police chief to be able to work closely with the city's legal advisor, Lee Parker. It is also important for the city administrator and chief of police to work together to provide services for the city. "In fact, the differing points of view were such that the city was not getting the services it should, so there was a problem there." (Quinn dep. at 148-49).

The citizens perceive the city's law enforcement policies largely through the way in which Quinn operated the city's police department.

As chief of police, it was one of Quinn's responsibilities to either perform police investigations or to oversee the conduct of investigations, to accurately report the investigations, to maintain the integrity of records control systems, to maintain the evidence room and to supervise the law enforcement officers under him. He also made decisions regarding who to hire to fill officer positions.

The defendant contends that Quinn joined the police union or Fraternal Order of Police in 2004. Quinn denies actually joining the union. However, it is uncontroverted that Quinn filled out an application for FOP membership and paid his membership dues. The facts establish that the Bel Aire department at the time was one officer short of the ten officers required for FOP eligibility, and Quinn signed up so that a chapter could be established. "The FOP didn't seem to have a big problem with that. They were a little bit surprised by it." (Quinn Vol. III, 276).

It is uncontroverted that Quinn was never asked to discipline or punish any police officers for speaking to the city council or for otherwise speaking out on matters of public concern. Quinn stresses that several days before he was fired, a city council member criticized him for allowing police officers to speak, and that on the same day he was fired, another officer (Marshall Matthews) who had spoken out was also fired.

On June 28, 2004, Bel Aire police officers presented two letters to the mayor complaining about various matters primarily related to a complaint that the "city administration has become arbitrary and unfair in its treatment of the Chief of Police and thereby all of the officers." The letters did not mention unionization.

Although Quinn had discussed water rates with one of the commissioners, he had discussed them as an advocate for the city's position.

Quinn was never asked to impede or do anything specific to the officers with respect to a union. Quinn attempts to controvert this fact by stating that he was verbally attacked for letting the officers join a union.

It was within Quinn's official duties as chief of police to either directly investigate obstruction of official duty allegations against Parker, Gale and Wilson, or to oversee such an investigation by a subordinate.

Part of Quinn's official duties as chief was to be responsible for access to computer-accessed criminal records and similar information.

Quinn's relationship with the city administrator, Richard Gale, initially became strained in 2002, when the officers in the police department met with Gale to present complaints in Chief Quinn's absence.

Quinn testified in a Municipal Court prosecution for speeding regarding the placement and location of a speed limit sign. The defendant in the case produced a video tape demonstrating that Quinn's testimony was false. Quinn has stated that his error was unintentional, and the city prosecutor has said the same thing. However, the city prosecutor never again called Quinn as a witness.

According to District Attorney Foulston, the number one priority for Chuck Quinn as police chief was his obligation to safeguard the sanctity of the evidence that he was going to turn over to the prosecutor.

The next incident straining Quinn's relationship with city administrator Gale involved ongoing conversations "about them tapping our computer." This complaint arose from information that led Quinn to believe that Gale, as city administrator, had the ability to access information on the police department's computers.

McClellan Solutions, Inc., was hired by Bel Aire to write a software program to send criminal information to the Kansas Bureau of Investigation. To do this, they spoke with the KBI to determine the most appropriate way to do the work. Gary McClellan, representative of McClellan Solutions, Inc., stated that City Administrator Gale "wanted to have the system configured so that he would know everything that the police department was investigating." As explained by Mr. McClellan, " It appeared to us that he wanted to be able to compile all information going on in the police department about who was being investigated." McClellan informed the Chief of Police about Gale's conduct as he believed this was improper.

The reference to the McClellan statement is an instance of multiple hearsay, reflecting statements which McClellan heard from various unnamed intermediaries about what Gale allegedly said. The statement supplies no information as to the identity of this person or persons, other than the statement by McClellan that the cited fact "appeared" to him based upon what he "learned" from some unidentified person. This evidence fails to meet the standards required for proof of facts in summary judgment practice.

The Kansas Highway Patrol (KHP) is responsible for monitoring access to criminal history records by computer. Quinn talked to Gale about the KHP's requirement for a secure computer system. He also wrote to and spoke with Sgt. Bob Eckert who oversees the KHP computer system. Quinn told Eckert that Gale believed a city administrator was entitled to access this information. Eckert told Quinn that he would work with the McClellans to ensure the system was protected.

The Bel Aire police computer system was established by a computer consultant who worked with the Highway Patrol to establish the computer system in accordance with required regulations. The system passed an audit in 2004 for compliance with regulations. The purpose of the KHP audit

was limited to whether there had been appropriate training, message content and dissemination of the information. The audit did not determine whether or not all access was proper.

Quinn never heard anything from Gale indicating that he had accessed computer-based criminal documents or criminal history information.  The Highway Patrol told Quinn it was not concerned about Gale accessing NCIC information, because he did not have the necessary "token" to access the information. Quinn states that he was concerned  Gale could access NCIC information which had previously been called up on a terminal by a police officer.

On July 1, 2004, Quinn received a call from city attorney, Lee Parker. Parker alerted him to a dispute between citizens over property. Parker said that was a civil matter and that the city officers should not intervene but only stand by to keep the peace. Quinn's notes of this conversation state: "He had been contacted by an attorney. There was a dispute over ownership of trucks at City-Wide. It's a civil matter, will be decided by courts. If complaint received, do not take trucks or assist in taking of trucks. If a disturbance occurs take appropriate police action." (Quinn at 69-71)

Quinn alleges that Parker's act of contacting him at home on July 1 to inform him that the police should not intervene in a civil matter constituted obstruction of justice. Quinn's narrative report states:

> What Parker was saying was clear and unequivocal and I did not question his directions. We have encountered civil matters in the past and always defer to the courts in such matters. Parker's position entitled him to give instructions and legal advice to the Police Department. He has done so repeatedly over the past several years, and I had no reason at the time to question his directions.

(Quinn Exh. 1).

Quinn was contacted by the owners of City-Wide Plumbing, Marilyn and Lloyd Barton, who reported that one of their employees had quit and was holding their trucks, computer and business records hostage in a dispute over a vacation time claim. Quinn urged them to consult with their attorney and gave them Lee Parker's number.

Sedgwick County District Attorney, Nola Foulston, spoke with Quinn on July 13, 2004. Foulston stated she had been contacted by Marilyn Barton who complained that she had gone to the

employee's house to retrieve the company vehicles and was told by law enforcement officers that the officers could not assist them because it was a civil matter, and they would have to work with their attorney. Foulston confirmed that a lawsuit had been filed by the employee on July 2, 2004, and an order of attachment had been issued by the court.

Foulston later spoke to city attorney Lee Parker, who told her that he had received a call from attorney James Wilson, who said there were corporate issues with City-Wide Plumbing which involved a civil matter and that the police should not get involved. Wilson told Parker he was filing a lawsuit the next morning. Parker told Foulston he was "real tenuous about" court order things and did not want to get in the middle of civil issues. (Foulston, at 18). Foulston understood from Parker that his concern was that the city might have liability if the officers intervened in determining distribution of the property.

Foulston is not a law enforcement officer, nor is she the "boss" of any law enforcement agency. She works in concert with law enforcement agencies. She recognizes that the law enforcement agency must work with its legal counsel on correct procedures. She does not consider herself to be the legal advisor for any law enforcement agency.

Foulston next talked with Sedgwick County Judge Friedel and arranged a hearing in the civil case filed by Wilson. Sometime in July or August, the Bartons advised Foulston that they preferred not to press criminal charges against the former employee.  By July 14, 2004, Foulston's assistant, Ann Swegle, told Quinn that Foulston was considering the property case to be a civil matter rather than a criminal theft case but her office was continuing to look at the conduct of Wilson.

On July 14, 2004, Quinn had initiated a case file on a potential obstruction of justice crime. Quinn had also reminded Parker  once or twice  that Foulston wanted a statement from him.

Foulston did not believe there was any criminal conduct of Lee Parker, but she did want to secure a report from him related to Wilson.  Foulston met with Parker on September 9 and secured a statement from him. She informed him she was not investigating him. Parker provided Foulston a written statement dated September10 which was consistent with his earlier statements.  Foulston

ultimately stated that she did not think Parker had committed a crime, and found no impropriety in Lee Parker's conduct at all.

Other than Quinn, no one ever identified Parker as a suspect for obstruction of justice, although Quinn states that he used the term in reference to Parker, and neither Swegle nor Foulston disagreed.

Quinn objected to city administrator Gale having a key to the evidence room. He objected within two weeks after Gale first secured the key, shortly after the city moved into a new building in April 2004. Gale informed Quinn that as the city administrator, he needed to have all the keys. Quinn's complaints about civilian access to the computers were long standing. He complained as early as November.

Quinn had complained to the mayor in September 2003 about Gale's position that he maintained civilian authority over the police department.

At the September 7, 2004 meeting of the City Council, Police Officer Marshall Matthews addressed the council and spoke on the issue of water rates.

Quinn does not recall whether or not the evidence room or computer issues were discussed on September 7, 2004, when Quinn was questioned in executive session with the city council.

Quinn never informed anyone at the city that he had complained to Foulston about the computers or the evidence key. Foulston later sent a letter to Quinn and Parker stating that the security of evidence and criminal files should be improved. She stated that as to the evidence room, "(1) non-evidentiary items must be removed and (2) access must be totally restricted to law enforcement personnel." The letter arrived in city hall on September 14, 2004.

The assistant city attorney prepared a memorandum for the mayor and council which analyzed the problems existing because of differences in philosophical approaches of Quinn and the city administrator and mayor. Bel Aire's mayor believed there was a consensus of the governing body that Quinn's behaviors would not change, which led to the request for his resignation. Gale told the council he could no longer work with Quinn.

9

On September 14, 2004, city administrator Gale contacted Quinn while he was in Lawrence, Kansas, at a training seminar and asked that he come to a meeting with the mayor on September 15. Quinn attended the meeting at Bel Aire City Hall in a conference room next to Parker's office. Parker tape recorded the meeting. Quinn prepared a transcript of the tape recording himself

At the start of the meeting, Mayor O'Neal read a letter asking for Quinn's resignation. Quinn was told if he did not resign, a termination process would begin. Quinn asked Parker to explain that process:

> O'Neal:   Well, there is, um, I have a resignation document and if you choose not to sign a resignation document, then I will begin termination process. And there's a process by which we go through which is, Mr. Parker can explain.
>
> Quinn:    Would you explain the process?
>
> Parker:   Sure. The process is one, um, that basically the document is given to you and read to you. At that point then you are given an opportunity to go ahead and make a verbal response. And then you are also given an opportunity until — which is three working days under the, uh, under the handbook and policies to provide any written response or until the termination. Um, and that would all be explained to you as part of that process.
>
> Quinn:    I can have some sort of hearing, is that what you're saying or I do not?
>
> Parker:   Yes, you would.
>
> Quinn:    You would be the person that is holding the hearing?
>
> Parker:   The person would be, it would be, it's set up pursuant to the handbook. Um, it would normally be the, the city clerk and the city attorney, but I am recusing myself from that, um, and there will, there will be someone else that will be designated to do that."

(Quinn Exh. 6, at 2).

Quinn believed that the process outlined by Parker would have been followed but believed that the process would be "bogus." (Quinn at 151-52). The only reason Quinn decided not to follow the termination process was that he believed the hearing would be set up in some way by Parker.

10

Quinn admits that another officer, Matthews, was subjected to the same process, given a termination letter, disputed the letter, went to an appeal and was reinstated. Matthews was ultimately again terminated eight months later; there is no evidence for the reason.

Quinn denies that he voluntarily resigned but claims he was forced to resign because the alternative of a termination proceeding would have been a "sham proceeding here where Mr. Parker was engineering a disposal of a person who was accusing him of a crime and believed that he had committed a crime." (Quinn at 157-158).

Quinn said: "I'm assuming here, and correct me if I'm wrong, that this is essentially a settlement. If I'm understanding this right, to, to head off litigation. Is that about what this is? And if it is to head off litigation, then I would really want to have an understanding as to where we're going before I foreclose that possibility, uh." (Quinn Exh. 6, at 3).

Quinn believed he was entitled to compensatory time and requested payment for compensatory time. Lee Parker advised Quinn that he was an exempt employee not entitled to compensatory time.

Mayor O'Neal stated "Chuck, okay, Chuck. Um, let's talk about the comp time. Here's what we're willing to offer, uh, for the resignation. In addition to your four months severance, uh we would offer you $10,000 cash on top of that four months of, um, severance." (Id. at 5).

Quinn next requested that his resignation not be effective until he had finished his training so he would not lose certification. The city agreed. Quinn asked that the city report the resignation to the State of Kansas as voluntary. The city further agreed to pay for the completion of Quinn's training and for his expenses. Quinn then signed the letter of resignation "subject to all those agreements including the certification to the State." (Id. at 9).

The conversation during the conference was calm with no yelling or screaming. The conference took about 45 minutes. Quinn spoke with the mayor, city council members, and secured benefits pay that they had not originally intended to grant him. Quinn signed a letter of resignation,

11

was paid for comp time, and asked that the city tell anybody who asked that his resignation was voluntary.

Prior to the meeting, there had been no actual or threatened disciplinary action against Quinn. Just four months earlier he had been re-appointed by the mayor for the fifth time and the council had unanimously approved the appointment.

Officer Marshall Matthews was fired one hour after Quinn's resignation by the same three representatives from the city. He was told that he was being fired for speaking out on matters of public concern at a public meeting and also because he had filed bankruptcy within a period of five years prior to his hiring date.

Subsequently, Quinn applied to the Kansas Law Enforcement Training Center (KLETC) for employment.  In his application, Quinn stated that he had been appointed to serve at the pleasure of the mayor, and the mayor had asked for his resignation due to philosophical differences. Quinn believed both statements to be true.

Quinn received all payments under the agreement for resignation, but has refused to negotiate the check.

The City of Bel Aire has published no information that plaintiff's resignation was involuntary. Quinn was never publicly accused by the city of "doing anything wrong." (Quinn dep. at 265-66). Quinn has no evidence that the city has provided any negative reference in response to an employment inquiry, or that there was any contact between the city and KLETC about his employment application.

The only public statement by the city regarding plaintiff's separation from employment that plaintiff contends was false was the city's report that Quinn had resigned and that there was "no problem." (Quinn dep. V.3, at 266-67)

Quinn began work as a part-time police officer for the City of Valley Center in October 2004. He began full-time employment with the City of Wichita beginning December 3, 2005, as a

12

security supervisor responsible for a 15-member security force that provides security for the city building and other alarmed city properties with a salary in the range of $48,000.

Quinn initially testified that the speech which he claims motivated the request for his resignation involved his conversations with the district attorney and delivering of reports to her between July 13 and July 18 relating to the City-Wide Plumbing matter. Quinn engaged in all of that speech in his official capacity in performing his duties as chief of police.

Quinn was asked:

Q. Was there any other speech that you claim motivated the city to request your resignation?

A. Again, none that I can think of.

Q. Okay. I'm not restricting that to the district attorney's office. Any other speech at all that you claim was protected speech that you claim caused the city to request your resignation?

A. I'm still drawing a blank. The only one I can think of is that.

(Quinn at 211-12). Quinn made no corrections or additions to this testimony upon review of the deposition.

The only reason Quinn has not cashed the check received from the city was because of concern that it would provide the city a defense to his claims and he thought of the check as "evidence." (Id. at 214-15).

On July 26, 2005, plaintiff submitted a notice of claim to the city pursuant to K.S.A. 12-105b(d). The notice of claim asserted that plaintiff had been subjected to retaliation because of whistleblowing related to his involvement in investigating allegations of obstruction of justice by the city attorney and city administrator, allegations that the city administrator had a key to the evidence locker and allegations that the city administrator had access to criminal history information on police computers.


**Federal Claims**

13

The court finds, first, that summary judgment is appropriate as to Quinn's claims for wrongful discharge because he was not discharged; he resigned.  The plaintiff in this context must show an objective basis of believing that further employment was impossible and that his resignation was not the product of his own free will.  *Yearous v. Niobrara County Mem. Hosp.*, 128 F.3d 1351, 1356 (10th Cir. 1997).  *See also Lenz v. Dewey*, 64 F.3d 547, 552 (10th Cir. 1995).  To determine whether, in a claim for wrongful discharge, a given resignation was voluntary or coerced, four factors are relevant.

> A resignation will be involuntary and coerced when the totality of the circumstances indicate the employee did not have the opportunity to make a free choice. [*Stone v. University of Md. Medical Sys. Corp.*, 855 F.2d 167,] 174 [(4th Cir.1988))]; *see also Scharf v. Department of Air Force*, 710 F.2d 1572, 1574 (Fed.Cir.1983) (to determine if resignation is voluntary look at circumstances to determine if employee had opportunity to exercise free choice).

> > Factors to be considered are (1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; and (4) whether he was permitted to select the effective date of resignation.

> *Stone*, 855 F.2d at 174; *see also Dusanek v. Hannon*, 677 F.2d 538, 543 (7th Cir.) (resignation resulting from choice between resignation and dismissal proceedings is not a discharge by coercion if the employee is given time and opportunity for deliberation before making a choice), *cert. denied*, 459 U.S. 1017, 103 S.Ct. 379, 74 L.Ed.2d 512 (1982). A choice between resignation or termination does not establish that the resignation was involuntary, unless the employer lacked good cause to believe that there were grounds for termination. *Stone*, 855 F.2d at 174; *cf. Illinois ex rel. Schoepf v. Board of Educ. of Morton High Sch., Dist. 201*, 606 F.Supp. 385, 390 (N.D.Ill.1985) (due process claim waived when choice between resignation and separation was voluntary because employee could not show his superior knew or believed the reason for the proposed separation could not be substantiated).

*Parker v. Board of Regents,* 981 F.2d 1159, 1162 (10th Cir. 1992).

Here, the plaintiff stresses that the mayor initially asked him for his immediate resignation, and that "[h]e was told of no other possibilities until he specifically asked."  (Resp. at 43), that he did not understand the hearing process, and that the plaintiff in *Parker* was given a week to consider his options while he was given a much shorter time.  Nevertheless, Quinn did ask about alternatives to immediate resignation.  He then proceeded to actively, and effectively, negotiate his rights.  The tape-recorded meeting took the better part of an hour and everyone participated calmly and

14

rationally. Quinn was able to actively negotiate and advance his interests. He understood that the city was essentially proposing a settlement of his legal claims against the city.

In his response, Quinn also cites several state cases from outside Kansas on the issue of discharge. *See Hinthorn v. Roland's of Bloomington, Inc.*, 119 Ill.2d 526, 519 N.E.2d 909 (1988), *Wilder v. Cody Country Chamber of Commerce*, 868 P.2d 211 (Wyo. 1994), and *Sheets v. Knight,* 308 Or. 222, 779 P.2d 1000 (1989), *overruled on other gds*, *McGanty v. Staudenraus*, 321 Or. 532, 549, 901 P.2d 841 (1995). The *Hinthorn* case involved not a claim of constructive but actual discharge, as the court stressed, pointing out that the "plaintiff did not claim that she was driven by the employer's actions to voluntarily resign, but that she resigned *involuntarily* only because she was explicitly directed to do so by her employer." 119 Ill.2d at 529, 519 N.E.2d at 911. The decision was based on a factual finding that the plaintiff, who was in pain and in need of medical attention, was essentially forced to sign an agreement she did not understand. *Wilder* involved a claim of breach of implied contract by a chamber of commerce executive who alleged direct rather than constructive discharge, and the plaintiff in that case was "given the option of resigning his position immediately or being terminated the next day." 868 P.2d at 215. In *Sheets*, the court stressed that the plaintiff was "unconditionally ... told 'resign or be fired'" without any suggestion of any appeal process, so that the plaintiff "could not avoid the day of reckoning." Id. at 1005 and n.5.

The plaintiff has failed to demonstrate the existence of a material question of fact requiring a trial. None of the salient facts in the cited cases are present here. Quinn was given the opportunity to discuss the proposed resignation and actively negotiated with the city, obtaining benefits which the city did not originally plan to grant. Quinn was presented with the alternatives of resignation or pursuing an alternative grievance procedure which would at the least defer the termination. Quinn understood that the agreement was essentially a settlement of his claims.

Quinn's subjective suspicions that an appeal process would be "rigged" are insufficient; he must show some objective basis for concluding that the termination appeal would be fraudulent. *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 343 (10th Cir.1986). Quinn has failed to shown that a

15

reasonable person in his position would necessarily conclude that an appeal was hopeless.  At approximately the same time, the city requested the resignation of another officer, who chose to pursue and appeal, which was successful and the officer was reinstated.  The officer was ultimately terminated on unrelated grounds.  The evidence fails to show that, at the time of his termination, Quinn had an objective basis for concluding that an appeal would not succeed. Instead, the evidence shows that Quinn resigned because he successfully negotiated for benefits which the city had not otherwise planned to extend.

The city also argues that Quinn waived any rights by his voluntary resignation, citing *Parker*, 981 F.2d 1159 (10th Cir. 1992).  Quinn provides no direct response to this argument.

Even if the court were to directly address the merits of Quinn's first amendment claims, summary judgment would still be appropriate, since the various instances of speech cited by Quinn as the basis for his dismissal were rendered pursuant to his official duties.  In *Garcetti v. Ceballos*, _____ U.S. _____, 126 S.Ct. 1951 (May 30, 2006), the Supreme Court recently concluded that a supervising district attorney, who was terminated after making statements that a search warrant had contained misrepresentations, did not state a valid First Amendment claim, since the speech in question arose from the plaintiff's official duties.  As a result, the plaintiff's governmental employer was acting to promote "the proper performance of governmental functions" by regulating the performance of an employee in his official duties.  *Id.* at 1957.  The Court wrote:

> The controlling factor in Ceballos' case is that his expressions were made pursuant to his duties as a calendar deputy. See Brief for Respondent 4 ("Ceballos does not dispute that he prepared the memorandum 'pursuant to his duties as a prosecutor'"). That consideration-the fact that Ceballos spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case-distinguishes Ceballos' case from those in which the First Amendment provides protection against discipline. We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.
>
> Ceballos wrote his disposition memo because that is part of what he, as a calendar deputy, was employed to do. It is immaterial whether he experienced some personal gratification from writing the memo; his First Amendment rights do not depend on his job satisfaction. The significant point is that the memo was written pursuant to Ceballos' official duties. Restricting speech that owes its existence to a

public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created. *Cf. Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) ("[W]hen the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes"). Contrast, for example, the expressions made by the speaker in Pickering, whose letter to the newspaper had no official significance and bore similarities to letters submitted by numerous citizens every day.

Ceballos did not act as a citizen when he went about conducting his daily professional activities, such as supervising attorneys, investigating charges, and preparing filings. In the same way he did not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case. When he went to work and performed the tasks he was paid to perform, Ceballos acted as a government employee. The fact that his duties sometimes required him to speak or write does not mean his supervisors were prohibited from evaluating his performance.

*Id*. at 1959-60.

The plaintiff argues against the application of *Garcetti* here by citing the decision of Judge Lungstrum in *Cheek v. City of Edwardsville*, 2006 WL 2802209 (D.Kan. Sept. 29, 2006), in which the court refused to dismiss a First Amendment claim, advanced by a plaintiff police major who had been terminated after complaining of the improper suppression of criminal charges, pursuant to *Garcetti*. However, this decision has little application here given the procedural posture in which that decision was rendered. In *Cheek*, the issue arose out of the defendant's motion to dismiss; therefore the court had no facts upon which to base a factual finding that the speech related to the plaintiff's status as a private citizen rather than official duties. *Id.* at *2. Focusing on the plaintiff's job title, the court stressed that the plaintiff was a major in the police department and therefore inferred his job was primarily managerial. Accordingly, the court could not conclude as a matter of law that investigating and reporting criminal activity fell within the plaintiff's official duties. Here, however, the uncontroverted facts show that the plaintiff Quinn directly supervised criminal investigations conducted by his subordinates, and sometimes conducted such investigations himself. The speech in question involved reporting crimes or maintaining the integrity of the city's custody of criminal evidence and records. Each of these matters is directly within the plaintiff's official duties.

Moreover, even assuming that the speech in question arose from Quinn's status as a citizen rather than pursuant to his official duties, summary judgment would also be appropriate.  Pursuant to *Pickering v. Bd. Of Educ.*, 391 U.S. 563,(1968) and *Connick v. Myers*, 461 U.S. 138, (1983), the court applies a four-part test to determine whether a plaintiff has presented a valid claim of First Amendment infringement:  (1) Does the speech involve a matter of public concern?  (2) Does the plaintiff employee's speech interest outweigh the government employer's interest in an efficient and effective workplace?  (3) Was the speech a substantial reason for the job action?  (4) Would the employer have made the same decision even in the absence of the protected speech?

Here, the city argues that the plaintiff's claim fails under the second factor, since even if there were a valid claim of First Amendment infringement, Quinn's interest in speech is outweighed by the city's interest in providing an effective city government.  In this context, with respect to the controversy of the City-Wide plumbing case, the city stresses that the city attorney's recommendation was entirely correct as a matter of law, and that absent a breach of the peace, the police should not attempt to resolve competing civil property claims.  *See Lytle v. City of Haysville*, 138 F.3d 857 (10th Cir. 1998).  The city also contends that requiring Quinn to resign was justified given the disruptive relationship which had developed between Quinn and other city officials. *See Hall v. Ford*, 856 F.2d 255, 261 (D.C. Cir. 1988).

Quinn disputes the existence of any disruptive relationship.  For example, with respect to the unionization of the city police force, he stresses that his involvement was merely "one act — argeeing [sic] to submit an application so that the police department had enough members to at least consider membership in the F.O.P. — an organization to which Quinn had belonged in the past. Once he submitted an application he took no further acts toward the union."  Resp. at 36.

But this would be an instance where "one act" is clearly sufficient to create a highly disruptive relationship, one in which the plaintiff Quinn played a decisive role in thwarting an established city policy regarding unionization. Further, the insinuations and accusations of unethical or criminal wrongdoing which the plaintiff launched against another city officer created such a

18

poisonous atmosphere that the court finds that no violation of Quinn's First Amendment rights occurred.

Finally, with respect to Quinn's federal claims, the city seeks summary judgment as to the claims of a violation of plaintiff's liberty interests.  The city argues that no liberty interest is implicated because the city never published any negative or critical information about Quinn or the reasons behind the resignation. *See Board of Regents v. Roth*, 408 U.S 564, 573 (1972).  Quinn does not respond to the argument, and the court finds summary judgment should be granted as to plaintiff's deprivation of liberty claims.


**State Claim**

The defendant city first moves for a dismissal of a portion of Quinn's state law whistle blower claim pursuant to K.S.A. 12-105b, because the issues of unionization and the treatment of Matthews were not mentioned in the notice of claim submitted to the city.  Quinn's response states that these claims relate to his federal claims.

The Pretrial Orders states as "essential elements" of this state law claim merely that he was terminated because he "engaged in good faith reporting to outside law enforcement officials of a serious infraction of the law by the defendant's employees." (Dkt. No. 37, at 8). The Order presents no allegations that the additional arguments added in October, 2006 were advanced in support of the state law claim.  Accordingly, the court interprets plaintiff's state law claim to rest solely upon Quinn's reporting the alleged criminal activity of the city attorney, and the city's motion is not granted on the grounds cited.

Turning to the validity of the state law claim itself, the city advances two arguments.  First, citing *Getz v. Board of County Com'rs*, 194 F.Supp.2d 1154, 1169-70 (D.Kan. 2002) and *Merkel v. Leavenworth County Emergency Med. Serv.*, 2000 WL 127266, at \*12 (D. Kan. Jan. 4, 2000), that there is no state law claim where the plaintiff also possesses an adequate claim (even if potentially unsuccessful) for a violation of First Amendment rights, and, under *Crandon v. State*, 257 Kan. 727,

897 P.2d 92 (1995), cert. denied, 516 U.S. 1113 (1996), because the Kansas Supreme Court in that

decision essentially adopted the *Pickering* test in resolving state whistle blower claims.

In his response brief, Quinn provides no argument in opposition to the city's argument citing

*Getz*. In *Getz*, the court wrote:

> Kansas courts recognize a cause of action for retaliatory discharge where an
> employee is terminated for reporting to company management or law enforcement
> serious legal violations by co-workers or the employer. *See Koehler v. Hunter Care
> Centers*, 6 F.Supp.2d 1237, 1241 (D.Kan.1998) *(citing Palmer v. Brown*, 242 Kan.
> 893, 752 P.2d 685 (1988)). The substance of plaintiff's whistleblowing claim,
> however, is the same as her First Amendment claim: plaintiff alleges that she was
> terminated in retaliation for speaking out about unlawful practices at Shawnee
> County jail. Under Kansas law, the rule is that "an adequate alternative remedy
> precludes a common-law retaliatory discharge action." *Merkel v. Leavenworth
> County Emergency Med. Serv.*, 2000 WL 127266, at *12 (D. Kan. Jan. 4, 2000)
> (*quoting Flenker v. Willamette Indus., Inc*., 266 Kan. 198, 209, 967 P.2d 295, 303
> (1998)). When "allegations underlying plaintiff's state claim are the same as those
> underlying [her][S]ection 1983 claim ⋯ [S]ection 1983 clearly provides an
> alternative vehicle for plaintiff to pursue any injuries stemming from [her] alleged
> retaliatory discharge [and] does not limit plaintiff's right of redress in any significant
> way." *Merkel*, 2000 WL 127266, at *12. In *Merkel*, plaintiff alleged that defendants
> violated his right to free speech under the First Amendment and Section 1983 and
> also that they discharged him due to his speech in violation of Kansas state law. As
> in this case, plaintiff did not attempt to argue that his remedy under Section 1983 was
> inadequate. Even though the *Merkel* court granted summary judgment on plaintiff's
> First Amendment claim, it found that the existence of an adequate alternative remedy
> precluded plaintiff's state law retaliatory discharge claim. Id.

194 F.Supp.2d at 1169-70. As noted earlier, plaintiff provides no response to the defendant's

argument and the court finds that an adequate remedy for the complained-of conduct exists in

Quinn's First Amendment claim, whether or not that claim actually succeeds on the merits.

Accordingly, summary judgment is appropriate on that basis.

Quinn does address the city's argument regarding *Crandon*, but simply states summarily that

the *Crandon* court adopted the *Pickering* test "[n]owhere . . . even implicitly." (Dkt. No. 51, at 30).

This is incorrect. In *Crandon*, the plaintiff advanced both First Amendment and common-law

whistle blower retaliation claims. In Section II of its opinion, the Kansas Supreme Court upheld the

trial court's award of summary judgment against plaintiff's First Amendment based upon a

balancing test:

> The trial court in general held that an organization's general counsel has obligations different than those of other employees. In using the balancing test discussed below, an attorney's obligation (as general counsel) is first and foremost to the organization. The balancing test as applied here .... is set forth in *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), and *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and weighs an employee's First Amendment rights against the interests of the State as an employer in promoting the efficiency of the public services it performs through its employees.

257 Kan. at 740.

Applying that test, the court concluded that the termination of the plaintiff, a former general counsel to the Kansas State Bank Commissioner who had advanced claims of wrongdoing against a Deputy Bank Commissioner, was not actionable on First Amendment grounds because those allegations destroyed the "close relationship and need for trust" necessary in their relationship. After also rejecting (in Section III) a statutory civil service claim of the plaintiff, the court concluded by stating that "[*f*]*or the reasons stated* in sections II and III, plaintiff's common-law claims cannot be sustained." Id. at 744 (emphasis added).  In essence, the court treated the balancing of interests determination with respect to plaintiff's First Amendment claim as being equally fatal to her claim of common-law retaliation.

Also before the court is the defendant's argument that the plaintiff's state law claims should be dismissed for failure to exhaust administrative remedies.  The plaintiff argues that exhaustion is required only for civil service employees.  The defendant, citing *Purvis v. Williams*, 276 Kan. 182, 199-200, 73 P.2d 740 (2003), argues that the requirement of exhaustion applies to any "person aggrieved by an administrative decision."   Neither party cites any authority directly on point, and the court will not resolve the matter in light of the other findings herein.

**Accord and Satisfaction**

Finally, the city argues that the present action should be dismissed, since Quinn resolved the dispute through accord and satisfaction when he signed the resignation statement and accepted the negotiated benefits package.  Subsequently, pursuant to this agreement, the city has duly tendered a check to Quinn for those benefits.

Quinn stresses that there was no explicit written instrument reflecting any settlement, and that city counsel Parker was present during the meeting.  However, the question is not whether it would have been better practice to explicitly incorporate release language in the resignation letter, or whether Parker should have suggested the inclusion of such language.  The city argues that no formal written instrument is required to create a binding legal agreement surrendering legal claims. *Lewis v. Gilbert*, 14 Kan.App.2d 201, 785 P.2d 1367 (1990).  In that case, the Kansas Court of Appeals wrote:

> Unless required by statute or court rule, settlement agreements do not have to be reduced to writing to be valid. 15A Am.Jur.2d, Compromise and Settlement § 10, p. 782. The Kansas courts have found that an oral settlement agreement is binding. In *Nauman v. Kenosha Auto Transport Co.*, 186 Kan. 305, 349 P.2d 931 (1960), the defendant agreed to pay the Naumans $2,500 for damages sustained as a result of a nuisance caused by the defendant's sewage disposal system. The settlement agreement was entered into orally between the attorneys for both parties. Shortly after entering the agreement, the defendant's attorney informed counsel for the Naumans that his client had changed his mind, and the settlement was off. The trial court found an agreement had been made and awarded the Naumans $2,500. The Supreme Court affirmed, stating:

>> The law favors the compromise and settlement of disputes, and when parties, in the absence of any element of fraud or bad faith, enter into an agreement settling and adjusting a dispute, neither party is permitted to repudiate it. (*Lewis v. Kimball*, 103 Kan. 173, 173 Pac. 279; and *Massey-Harris Co. v. Horn*, 132 Kan. 206, 294 Pac.666.) After the parties had agreed upon a compromise of a bona fide dispute, the courts will not, in the absence of any element of fraud or bad faith, look into the merits of the original controversy to discover which was in the right.

> 186 Kan. at 310, 349 P.2d 931.

> In *Connor v. Hammer*, 201 Kan. 22, 439 P.2d 116 (1968), the parties were involved in an automobile accident, which resulted in the death of Mrs. Connor. The parties orally agreed to settle the case, after which the attorney representing Connor's estate confirmed the settlement agreement by letter, which stated, "we are accepting your settlement offer of compromise ··· for the sum of $1500.00." 201 Kan. at 23, 439 P.2d 116. Later, the plaintiffs changed their minds and tried to repudiate the settlement. The court enforced the settlement, noting, "The law favors the compromise and settlement of disputes and when parties, in the absence of any element of fraud or bad faith, enter into an agreement settling and adjusting a dispute, neither party is permitted to repudiate it." 201 Kan. at 24, 439 P.2d 116.

> Settlement agreements need not be in writing to be enforceable under Kansas case law. Once entered into, settlement agreements should be enforced absent a finding of fraud or bad faith. Here, Lewis does not allege fraud or bad faith but rather

22

simply changed her mind with regard to the settlement. Accordingly, the oral agreement entered into between Lewis and Gilbert should be enforced.

14 Kan.App.2d at 202-03.

Here, it is uncontroverted that Quinn understood the effect of the parties' negotiations was that he would settle any potential claims against the city.  While it would have been better practice to also set forth this agreement in a written instrument, the court finds that Quinn's admission, coupled with the tape-recorded meeting which fails to give any indicia of fraud or bad faith, provides sufficient evidence of a binding settlement agreement, and the court therefore finds that any claims advanced herein should be dismissed in light of the accord and satisfaction existing between the parties.

IT IS ACCORDINGLY ORDERED this 26th day of February, 2007 that the defendant's Objection to Magistrate Order (Dkt. No. 40) is denied; the defendant's Motion for Summary Judgment (Dkt. No. 41) is granted.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE